MODIFIED

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 13, 2020

Lyle W. Cayce
Clerk

———————

No. 17-51060

———————

WHOLE WOMAN'S HEALTH, *On Behalf of Itself*, ITS STAFF,
PHYSICIANS AND PATIENTS; PLANNED PARENTHOOD CENTER
FOR CHOICE, *On Behalf of Itself*, ITS STAFF, PHYSICIANS, AND
PATIENTS; PLANNED PARENTHOOD OF GREATER TEXAS
SURGICAL HEALTH SERVICES, *On Behalf of Itself*, ITS STAFF,
PHYSICIANS, AND PATIENTS; PLANNED PARENTHOOD SOUTH
TEXAS SURGICAL CENTER, *On Behalf of Itself*, ITS STAFF,
PHYSICIANS, AND PATIENTS; ALAMO CITY SURGERY CENTER,
P.L.L.C., *On Behalf of Itself*, ITS STAFF, PHYSICIANS, AND
PATIENTS, *doing business as* ALAMO WOMEN'S REPRODUCTIVE
SERVICES; SOUTHWESTERN WOMEN'S SURGERY CENTER, *On
Behalf of Itself*, ITS STAFF, PHYSICIANS, AND PATIENTS; CURTIS
BOYD, M.D., ON HIS OWN BEHALF AND ON BEHALF OF HIS
PATIENTS; JANE DOE, M.D., M.A.S., ON HER OWN BEHALF
AND ON BEHALF OF HER PATIENTS; BHAVIK KUMAR, M.D.,
M.P.H., ON HIS OWN BEHALF AND ON BEHALF OF HIS
PATIENTS; ALAN BRAID, , M.D., ON HIS OWN BEHALF AND ON
BEHALF OF HIS PATIENTS; ROBIN WALLACE, M.D., M.A.S., ON
HER OWN BEHALF AND ON BEHALF OF HER PATIENTS,

*Plaintiffs—Appellees*,

*versus*

KEN PAXTON, ATTORNEY GENERAL OF TEXAS, IN HIS OFFICIAL
CAPACITY; SHAREN WILSON, CRIMINAL DISTRICT ATTORNEY
FOR TARRANT COUNTY, IN HER OFFICIAL CAPACITY; BARRY
JOHNSON, CRIMINAL DISTRICT ATTORNEY FOR MCLENNAN
COUNTY, IN HIS OFFICIAL CAPACITY,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Western District of Texas,
USDC No. 1:17-CV-690

Before Stewart, Dennis, and Willett, *Circuit Judges*.

James L. Dennis, *Circuit Judge*:

This appeal concerns the constitutionality of Texas Senate Bill 8 ("SB8" or "the Act"), a statute that requires a woman to undergo an additional and medically unnecessary procedure to cause fetal demise before she may obtain a dilation and evacuation (D&E) abortion, the safest and most common method of second trimester abortions. A number of licensed abortion clinics and physicians that provide abortion care services challenged that law, arguing that it would impose an undue burden on a woman's right to obtain an abortion before fetal viability in violation of the Fourteenth Amendment's Due Process clause. The district court agreed, declared the Act facially unconstitutional, and permanently enjoined its enforcement. The State appealed. Because SB8 unduly burdens a woman's constitutionally-protected right to obtain a previability abortion, we AFFIRM.

**I.**

In Texas and nationwide, a D&E abortion is the most common method of abortion after the first 15 weeks of pregnancy, as measured from a woman's last menstrual period (LMP).[1] As its name suggests, D&E is a two-step procedure. First, in the dilation stage, a physician dilates a woman's

---

[1] The gestational age of a fetus is measured by the time elapsed since the woman's last menstrual period (LMP). A woman's pregnancy is also commonly separated into three trimesters. The first trimester runs from the first through twelfth week and the second trimester runs from the thirteenth through twenty-sixth week. *See Stenberg v. Carhart*, 530 U. S. 914, 923-25 (2000). The third trimester begins the twenty-seventh week and continues through the end of the pregnancy.

cervix.    Second, during the evacuation stage, the physician uses a combination of suction, forceps, or other instruments to remove the fetus through the dilated cervical opening.  Because at 15 weeks LMP the fetus is larger than the dilated cervical opening, the fetal tissue usually separates as the physician moves it through the cervix, resulting in fetal demise.  This stage takes approximately ten minutes.

On May 26, 2017, the Texas legislature enacted the abortion regulation SB8.[2]  *See* Act of May 26, 2017, 85th Leg. R.S., ch. 441, § 6, 2017 Tex. Gen. Laws 1164, 1165–67 (eff. Sept. 1, 2017) (codified as TEX. HEALTH & SAFETY CODE §§ 171.151–.154).  Relevant here, the Act states:

> A person may not intentionally perform a dismemberment abortion unless the dismemberment abortion is necessary in a medical emergency.[3]

*Id.* § 171.152.  A "dismemberment abortion" is defined as:

> an abortion in which a person, with the purpose of causing the death of an unborn child, dismembers the living unborn child and extracts the unborn child one piece at a time from the uterus through the use of clamps, grasping forceps, tongs, scissors, or a similar instrument that, through the convergence of two rigid levers, slices, crushes, or grasps, or performs any

---

[2] The statute also contains other abortion-related regulations, including requiring fetal burial.  This appeal pertains only to the law's provision concerning the D&E procedure.

[3] A "medical emergency" is defined as:

life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that, as certified by a physician, places the woman in danger of death or a serious risk of substantial impairment of a major bodily function unless an abortion is performed.

*Id.* § 171.002.

combination of those actions on, a piece of a the unborn child's
body to cut or rip the piece from the body.

*Id.* § 171.151. Though SB8 does not use the term "dilation and evacuation"
or "D&E," the parties do not dispute that the Act applies to a D&E abortion.
Because fetal tissue separates as a physician removes it from the uterus
during the D&E procedure, SB8 prohibits such abortions unless the
physician first ensures fetal demise *in utero*—an invasive, additional step that
is not part of the D&E procedure. The Act thus requires an abortion provider
performing a D&E to carry out an extra, otherwise unnecessary procedure in
the woman's body to bring about fetal demise. A medical provider who fails
to comply with the law is subject to criminal penalties. *See id.* § 171.153.

Plaintiffs are eight licensed abortion clinics and three abortion
providers who challenged SB8 in federal court, contending that it places an
undue burden on a woman seeking a previability abortion. Defendants are
Texas law enforcement officers acting in their official capacity (collectively,
"the State"). They respond that the Act does not impermissibly restrict
abortion access because there are procedures that cause fetal death *in utero*
that must be used in addition to D&E to ensure an SB8-compliant abortion.
Plaintiffs in rebuttal argue that the additional procedures place a substantial
obstacle to a woman's right to a second trimester D&E abortion.

In August 2017, the district court granted a temporary restraining
order enjoining the law's enforcement. The parties then agreed to forego a
decision on a preliminary injunction and proceed instead to a trial on the
merits. In November 2017, the court held a five-day bench trial during which
it heard testimony from nineteen witnesses, including both sides' medical
experts. Later that month, the court issued extensive findings of fact and
concluded that SB8 imposed an undue burden on a large fraction of Texas
women seeking a D&E abortion after 15 weeks LMP. Accordingly, the

district court declared SB8 facially unconstitutional and permanently enjoined its enforcement. Defendants timely appealed.[4]

## II.

We review the district court's decision to permanently enjoin enforcement of SB8 for abuse of discretion. *See Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 270 (5th Cir. 2019). The court's underlying conclusions of law are reviewed *de novo*. *Guzman v. Hacienda Records & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015). Its findings of fact, on the other hand, are reviewed for clear error. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 573-74. And "[w]hen findings are based on determinations regarding the credibility of witnesses, [Federal] Rule [of Civil Procedure] 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575.

---

[4] Oral argument was held in November 2018. In March 2019, the court held this case in abeyance pending the Supreme Court's resolution of *June Medical Servs. L.L.C. v. Russo*, 140 S. Ct. 2103 (2020). Following the Court's decision in *June Medical*, we ordered supplemental briefing from the parties on the effect, if any, of that case on this appeal. In addition, the State moved for a stay of the district court's injunction pending appeal. A two-member majority of this panel denied the motion with one panelist in dissent. *See Whole Woman's Health v. Paxton*, 972 F.3d 649 (2020).

### III.

Since the Supreme Court's landmark decision nearly fifty years ago in *Roe v. Wade*, 410 U.S. 113 (1973), it has been clear that the Fourteenth Amendment guarantees a woman's right to choose to undergo a previability abortion. *See Roe v. Wade*, 410 U.S. 113 (1973). Two decades after *Roe*, in *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 846 (1992) (plurality opinion), the Court reaffirmed *Roe*'s "essential holding," further dividing it into a three-part legal framework:

> First is a recognition of the right of the woman to choose to have an abortion before [fetal] viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child.

*Casey*, then, "struck a balance." *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007). It protected, on the one hand, a woman's right to "mak[e] the ultimate decision to terminate her pregnancy." *Casey*, 505 U.S. at 879. On the other hand, it recognized that the state may enact previability regulations designed "to further the health or safety of a woman seeking an abortion" or "to express profound respect for the life of the unborn" so long as those regulations do not create "a substantial obstacle to the woman's exercise of the right to choose." *Id.* at 877-78. The State asserts here that SB8 advances its interests in "protecting unborn life" and promoting the integrity and ethics of the medical profession. The Court has acknowledged that "[t]he [state] may use its voice and its regulatory authority to show its profound respect for

the life within the woman." *Gonzales*, 550 U.S. at 157. And "[t]here can be no doubt the [state] has an interest in protecting the integrity and ethics of the medical profession." *Id.* (internal quotation marks omitted).

However, even when a state statute "furthers the interest in potential life or some other valid state interest," that statute "cannot be considered a permissible means of serving its legitimate ends" if it erects a "substantial obstacle in the path of a woman's choice." *Casey*, 505 U.S. at 877. The "shorthand" for a substantial obstacle is an undue burden. *Id.* Just a few years ago in *Whole Woman's Health v. Hellerstedt*, the Court confirmed that the undue burden "rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." 136 S. Ct. 2292, 2309 (2016) (citing the *Casey* Court's balancing of a law's benefits against its burdens).

The Supreme Court issued its most recent ruling explaining and applying the undue burden last Term in *June Medical Services, L.L.C. v. Russo*, 140 S. Ct. 2103, 2114 (2020). In that case, a 4-1-4 Court invalidated a Louisiana law that imposed an admitting-privileges requirement on abortion providers because the law imposed an undue burden on a woman's right to obtain an abortion. *Id.* at 2112-13. The four Justice plurality applied the balancing approach elucidated in *Whole Woman's Health*, weighing the statute's asserted benefits against its burdens. *See id.* at 2121-32. In a solo opinion concurring in the judgment, Chief Justice Roberts rejected the balancing test, stating that the undue burden test requires looking only to the burdens of an abortion regulation. *See id.* at 2136-37 (Roberts, C.J., concurring in the judgment). The dissenters also repudiated *Whole Woman's Health*'s "cost-benefit standard." *See id.* at 2182 (Kavanaugh, J., dissenting) (observing that the dissenters and concurrence disavowed the balancing test).

The parties dispute *June Medical*'s import. In supplemental briefing ordered after that decision, the State contends that because Chief Justice

Robert's concurrence is the narrowest opinion necessary to *June Medical*'s overall holding invalidating the Louisiana law, it thus provides the controlling formulation of the undue burden test. Conversely, Plaintiffs maintain that the Court's split decision supplies no such precedential rule on the undue burden test and therefore *Whole Woman's Health*'s balancing test still governs.

For reasons provided more fully in our order denying the State's stay motion, we agree with Plaintiffs. *See Whole Woman's Health*, 972 F.3d at 652-53. In brief, the issue turns on application of the rule in *Marks v. United States*, 430 U.S. 188 (1977). "Ordinarily, '[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as the position taken by those Members who concurred in the judgment[ ] on the narrowest grounds.'" *United States v. Duron-Caldera*, 737 F.3d 988, 994 n.4 (5th Cir. 2013) (first alteration in original) (quoting *Marks*, 430 U.S. at 193)). *Marks* makes clear that the views of dissenting Justices are irrelevant to determining the holding of the Court. Moreover, we have held that the *Mark*s "principle . . . is only workable where there is some 'common denominator upon which all of the justices of the majority can agree.'" *Id.* (quoting *United States v. Eckford*, 910 F.2d 216, 219 n.8 (5th Cir. 1990)). And when a concurrence does not share a "common denominator" with, or cannot "be viewed as a logical subset of," a plurality's opinion, it "does not provide a controlling rule" that establishes or overrules precedent. *Id.*

In *June Medical*, four dissenters agreed with the rule of decision advocated by the Chief Justice, but because they did not concur in or contribute in any respect to the judgment, but instead dissented therefrom, their votes cannot be counted as forming a holding of the Court. Further, though the plurality and concurrence shared an overall conclusion that the challenged statute constituted an undue burden, they disagreed on how to frame and

apply the undue burden test that led to that determination. Specifically, they disputed whether the test requires a comparative analysis or concerns only a law's burdens without regard to its asserted benefits. *Compare* 140 S. Ct. at 2132 (plurality opinion), *with id.* at 2141-42 (Roberts, C.J., concurring in the judgment). In this case, the concurrence cannot "be viewed as a logical subset of the" plurality's opinion. *Duron-Caldera*, 737 F.3d at 994 n.4. That is because accounting only for a law's burdens renders it impossible to perform a balancing test, which necessarily entails weighing two sides against each other. In other words, the plurality's and concurrence's descriptions of the undue burden test are not logically compatible, and *June Medical* thus does not furnish a controlling rule of law on how a court is to perform that analysis. *See id.*; *see also Eckford*, 910 F.2d at 219 n.8. Instead, *Whole Woman's Health*'s articulation of the undue burden test as requiring balancing a law's benefits against its burdens retains its precedential force.[5] *See* 136 S. Ct. at 2309.

The State claims, however, that *Whole Woman's Health*'s balancing test is limited to health-related regulations and does not apply when, as here, it invokes its legitimate interest in promoting respect for unborn life. True,

---

[5] The Eighth Circuit has come to a contrary conclusion, holding that Chief Justice Robert's separate opinion in *June Medical* is controlling because his vote was necessary to enjoining Louisiana's admitting-privileges law. *See Hopkins v. Jegley*, 968 F.3d 912, 915 (8th Cir. 2020). Though the Eighth Circuit cited *Marks*, it did not provide any interpretation of the *Marks* rule. We, however, are bound to apply our Circuit's construction of *Marks*, which entails determining whether the concurrence shares a common denominator with or can be viewed as a logical subset of the plurality opinion. *See Duron-Caldera*, 737 F.3d at 994 n.4.; *Eckford*, 910 F.2d at 219 n. 8. Because the Eighth Circuit did not mention—let alone apply—such an analysis, its holding is not persuasive and does not affect our decision. Further, the Eight Circuit observed that, when the views of Chief Justice Roberts and the dissenters were combined, a total of five Justices rejected the balancing test articulated in *Whole Woman's Health*. But by definition, dissenters do not concur in the judgment of the court but dissent therefrom; therefore, they are not members "who concurred in the judgment," and their views cannot be considered in determining the Court's holding. *Marks*, 430 U.S. at 193.

*Whole Woman's Health* considered statutes that purportedly protected women's health. *See id.* at 2310. But the balancing test dates back to *Casey*, and neither it nor *Whole Woman's Health* suggest that the undue burden standard changes based on the kind of state interest asserted. To the contrary, the Court's cases describe a unitary standard that applies regardless of the type of a state's claimed interests. *See, e.g.*, *Casey*, 505 U.S. at 877 ("[A] statute which, while *furthering the interest in potential life or some other valid state interest*, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends."). In *Casey*, for example, the Court applied the same undue burden standard to all of the regulations it reviewed, including parental and spousal consent provisions that were designed to further the state's interest in potential life. *See id.* at 898-99; *Whole Woman's Health*, 136 S. Ct. at 2309 (expressly stating that *Casey* performed a "balancing" test with respect to both of these provisions). It is unsurprising, then, that the State's argument that the undue burden changes based on the state interest asserted has been rejected by every other court that has considered the issue. *See, e.g.*, *EMW Women's Surgical Ctr. P.S.C. v. Friedlander*, 960 F.3d 785, 796 (6th Cir. 2020) ("Like other courts presented with this argument, we find it unpersuasive."); *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1326 (11th Cir. 2018) ("The State cites no support for the proposition that a different version of the undue burden test applies to a law regulating abortion facilities."). The State's argument in favor of creating an additional, novel undue burden test is inconsistent with the Supreme Court's cases, and we therefore dismiss it. *See Casey*, 505 U.S. at 898-99; *Whole Woman's Health*, 136 S. Ct. at 2309.

We proceed, then, to apply to SB8 the undue burden test in accordance with how it was explained and performed in *Whole Woman's Health*.

## IV.

An undue burden, we reiterate, exists when "a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877. We first note that, despite a law's possible benefits, the Supreme Court has repeatedly determined that a statute that would effectively ban the safest, most common method of second trimester abortion imposes an undue burden. *See, e.g.*, *Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 77-79 (1976) (invalidating a law that barred the then-"most commonly used" method of second trimester abortion); *Stenberg v. Carhart*, 530 U.S. 914, 938-39, 945-46 (2000) (holding unconstitutional a state law that, though it aimed to ban the "D&X" abortion procedure,[6] was written so broadly that it prohibited D&E abortions, too, which were "the most commonly used method for performing previability second trimester abortions"); *Gonzales v. Carhart*, 550 U.S. 124, 153, 165 (2007) (holding that the federal "Partial-Birth Abortion Act," 18 U.S.C. § 1531, which banned the D&X procedure, did "not construct a substantial obstacle to the abortion right," because the D&E procedure—the "most commonly used and generally accepted method" of second trimester abortions—remained available). Thus, if SB8 amounts to a prohibition on the D&E procedure, then it necessarily creates an undue burden on a woman's "effective right" to choose a previability abortion. *Casey*, 505 U.S. at 846.

The State insists that SB8 does not constitute an undue burden because several "alternative methods" of causing fetal demise are available and

---

[6] The D&X procedure, also known as intact D&E, involves dilating the cervix enough to remove the fetus intact. This procedure is banned under the Federal Partial-Birth Abortion Ban Act of 2003, unless fetal demise is induced before the procedure. *See* 18 U.S.C. § 1531; *Gonzales v. Carhart,* 550 U.S. 124 (2007) (upholding federal partial-birth abortion ban).

safe. Sister Circuits that have addressed challenges to substantially similar fetal demise statutes have determined that the methods of fetal demise that the State proposes here are not safe, effective, or available. *See EMW Women's Surgical Ctr. P.S.C.*, 960 F.3d at 807-08; *W. Ala. Women's Ctr.*, 900 F.3d at 1324-28; *see also Glossip v. Gross*, 576 U.S. 863, 882 (2015) ("Our review is even more deferential where, as here, multiple trial courts have reached the same finding, and multiple appellate courts have affirmed those findings."). Those courts thus held that the statutes at issue imposed an undue burden. Although we ultimately reach the same conclusion about SB8 based on our independent analysis, the holdings of other Circuits bolster our confidence that SB8 sets a substantial obstacle in the path of women seeking abortions.

Before examining the district court's findings on the State's proffered methods of fetal demise, we observe that there is a "fundamental flaw" in the State's description of these procedures as "alternatives." *EMW Women's Surgical Ctr. P.S.C.*, 960 F.3d at 798. "Fetal-demise procedures are not, by definition, *alternative* procedures," because a patient who endures such a procedure "must still undergo the entirety of a standard D&E. Instead, fetal-demise procedures are *additional* procedures. Additional procedures, by nature, expose patients to additional risks and burdens. No party argues that these procedures are necessary or provide any medical benefit to the patient." *Id.*; *see also, e.g.*, *Danforth*, 428 U.S. at 78-79 (invalidating an abortion restriction that "force[d] a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed"); *W. Ala. Women's Ctr.*, 900 F.3d at 1326 (noting the State's concession that fetal demise procedures "would *always* impose some increased health risks on women"); *Planned Parenthood of Cent. N.J. v. Verniero*, 41 F. Supp. 2d 478, 500 (D.N.J. 1998), *aff'd sub nom. Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127 (3d Cir. 2000) ("By relegating physicians to the

performance of more risk-laden abortion procedures, the Act imposes an undue burden on the woman's constitutional right to terminate her pregnancy.").

## A.

With this background, we address the three additional procedures the State proposes for causing fetal demise in utero: (1) injecting digoxin into the fetus or amniotic fluid; (2) injecting potassium chloride directly into the fetal heart; and (3) transecting the umbilical-cord. The district court found each of these methods to be unfeasible.

## 1.

The first procedure for causing *in utero* fetal demise that the district court considered was injection of the chemical digoxin into the fetus or amniotic fluid. This method requires a physician to insert a surgical needle approximately four inches in length through the patient's skin, abdomen, and uterine muscle, all without the aid of anesthesia. It is painful and invasive. Generally, physicians wait twenty-four hours after the injection before attempting the evacuation phase of a D&E, thereby requiring a patient to make an additional trip to the clinic one day before her appointment for the D&E procedure. Digoxin, moreover, fails to induce fetal demise about 5-10% of the time, with its effectiveness dependent on variables such as uterine and fetal positioning.

The district court observed that most studies in the record concerning digoxin injections focus on pregnancies at or after 18 weeks LMP, with only a few studies including cases at 17 weeks LMP. No study considered the efficacy, dosage, or safety of injecting digoxin into women before 17 weeks LMP. In light of this, the district court found that requiring digoxin injections before 18 weeks of pregnancy would subject women to an arguably experimental procedure without any counterbalancing benefits. And even when administered successfully after 18 weeks LMP, digoxin injections carry

significant health risks as compared to a D&E procedure performed before fetal demise is ensured, including a heightened risk of infection, hospitalization, and extramural delivery—the unexpected and spontaneous expulsion of the fetus from the uterus while the woman is outside of a clinical setting and without the aid of a medical professional.

Based on the pain and invasiveness of the procedure, the delay in care and logistical difficulties it necessitates, its unreliability, the unknown risks for women before 18 weeks LMP, and the risk of complication, the court found that digoxin is not a safe and viable method of inducing fetal demise before the evacuation phase of a D&E abortion.

The State challenges these findings, claiming that digoxin injections are unquestionably safe. The State essentially asks us to relitigate the district court's factual findings. But as an appellate court, even if we disagreed with the findings below, we cannot reverse them so long as they are based on one of two "permissible views of the evidence." *Anderson*, 470 U.S. at 573. The district court's findings satisfy this standard. The record evidence shows that digoxin injections indeed carry health risks for the pregnant woman, including a study demonstrating that digoxin injections are six times more likely to result in hospitalization as compared to injection with a placebo. The dangers of the procedure were further corroborated by the testimony of expert witnesses. *See Guzman*, 808 F.3d at 1036. In short, we see no error, clear or otherwise, in the district court's determination that digoxin injections are not a safe and feasible method of inducing fetal demise.

## 2.

Next, the district court assessed inducing fetal demise *in utero* through injections of potassium chloride. The procedure requires inserting a long surgical needle through a woman's abdomen and uterine muscles and into the fetal heart. Because at 15 weeks LMP the fetal heart is very small—the

size of a dime—the procedure demands great technical skill on the part of the provider. For the patient, the procedure is painful and invasive.

The injections are also exceeding rare because they carry severe risks for a woman; complications, including death, can result if the solution is injected in the wrong place. Because of the risks inherent with transabdominal injections, this procedure increases the risk of uterine perforation and infection. And no study exists on the efficacy or safety of the injection when administered before the evacuation phase of a D&E. The court thus determined that potassium chloride injections are an unnecessary and potentially harmful medical procedure with no counterbalancing medical benefit for women.

The court also explained that the training necessary to perform the procedure is generally available only to subspecialists in the field of high-risk obstetrics called maternal-fetal medicine. It would be "virtually impossible," the court found, for all physicians at abortion clinics in Texas to receive the requisite training in order for the procedure to be a meaningfully available method of fetal demise. Considering this evidence, the court found that potassium chloride injections are not a safe and workable method of inducing fetal demise.

Again, the State takes issue with the district court's findings. In particular, the State cites the testimony of a maternal-fetal medicine specialist, Dr. Berry, who has used potassium chloride to cause fetal demise. That one physician in a highly-skilled subspecialty may be able to perform the procedure does nothing to refute the district court's findings that, as a practical matter, there are not a sufficient number of physicians trained in the procedure to make it meaningfully available. Nor does it bear on the district court's finding—of which it noted there was "no credible dispute"—that the procedure carries severe risks. And it is undisputed that the procedure carries no

medical benefit for female patients. On this record, we cannot say that the district court's findings are "implausible." *Anderson*, 470 U.S. at 573.

**3.**

Last, the court reviewed the State's contention that umbilical cord transection is a viable method of inducing fetal demise. To perform this procedure, the physician dilates a woman's cervix such that instruments can be passed through to transect the cord. Guided by ultrasound, the physician then punctures the amniotic membrane, inserts an instrument into the uterus, grasps the umbilical cord, and cuts the cord with a separate instrument. The physician then waits for fetal heart activity to cease—usually within ten minutes—and then performs the evacuation phase of the D&E procedure.

The court found that this procedure is not a safe and feasible method of fetal demise for four reasons. First, the procedure is very difficult to perform, particularly if the umbilical cord is blocked by the fetus. Second, the court found that a lack of research on the risks associated with the procedure renders it essentially experimental. Third, cord transection carries significant health risk to the patient, including blood loss, infection, and injury to the uterus. A physician practicing in an outpatient clinic does not have access to blood services for patients at risk of serious blood loss. Fourth, there is insufficient training available to physicians on how to conduct the procedure.

The State also disagrees with these findings, noting that some of the abortion clinics' physicians have performed the procedure. Again though, this observation does not meaningfully address whether the district court's account of the evidence is not "plausible in the light of the record."

*Anderson*, 470 U.S. at 575. We are not persuaded that the court below committed clear error.[7]

**4.**

We summarize the court's overall findings regarding the effect of SB8. Under the statute, all women seeking a second trimester abortion starting at 15 weeks LMP would be required to endure a medically unnecessary and invasive additional procedure that provides no health benefit. The law increases the duration of what otherwise is a one-day D&E procedure. For most women, the length of the procedure would increase from one day to two, adding to the costs associated with travel, lodging, time away from work, and child care. This delay would be particularly burdensome for low-income women, many of whom must wait until the second trimester to seek an abortion because of the time needed to obtain funds to pay for the procedure.

SB8 also forces abortion providers to act contrary to their medical judgment and the best interest of their patient by conducting a medical procedure that delivers no benefit to the woman. And without substantial additional training, the State's proposed fetal-demise methods are not feasible for any physician other than subspecialists in the high-risk field of maternal-fetal medicine.

**B.**

Under *Whole Woman's Health*, having reviewed SB8's burdens, we next consider its asserted benefits. First, the State claims that, even if a balancing test applies, SB8 advances its interest in respecting unborn life by protecting it from what the State describes as "the brutality of being

---

[7] The State asserts that suction could be performed before 17 weeks LMP, contending that the district court overlooked this procedure. The court, however, found "adding any additional step to an otherwise safe and commonly used procedure" in of itself led to the conclusion that the State had erected a substantial obstacle in the path of a woman seeking a previability abortion.

dismembered alive." The district court observed that the D&E procedure is "graphic" but did not make any clear findings whether SB8 furthers the State's interest in promoting respect for potential human life. We note that SB8 does not purport to actually prevent the D&E procedure but instead has the effect of requiring invasive procedures to bring about fetal demise before the D&E is performed. Because some may sincerely believe that requiring fetal demise before the D&E procedure advances respect for potential life, we assume without deciding that SB8 provides a limited benefit in this respect. *See EMW Women's Surgical Ctr.*, 960 F.3d at 807.

Second, the State asserts that SB8 advances its interest in ensuring integrity and ethics in the medical profession. However, the Act confers no medical benefit for women patients while forcing them to undergo unnecessary, painful, invasive, and even experimental procedures. Like the district court, we are "unaware of any other medical context that requires a doctor—in contravention of the doctor's medical judgment and the best interests of the patient—to conduct a medical procedure that delivers no benefit to the [patient]." Whatever SB8 arguably may do to advance the State's interest in the medical profession is negated by the Act's forcing of physicians to act contrary to what is best in their medical judgment for their patients.

Third, the State contends that by requiring fetal demise *in utero*, SB8 serves its interest in having patients be informed about the procedures they are to undergo. It claims that Plaintiffs' consent forms do not explain in sufficiently graphic terms what happens to a fetus during a D&E procedure performed before fetal demise and that, by banning such a practice, women will no longer be able to choose this procedure based on a supposed lack of information as to what it entails. But the State's argument that SB8 ensures women are informed about how fetal demise occurs is wholly undermined by the fact that the statute does not require that women receive information on

how fetal demise occurs during any of the State's proposed additional procedures to cause fetal demise *in utero*.

Fourth, the State claims that the Act will promote its interest in aligning its laws with those of the international community. That the district court did not discuss this as one of the State's interests is understandable because the Supreme Court itself has never identified this as a valid interest to be considered as part of the undue burden analysis. Moreover, the State's comparative law expert acknowledged that most countries that prohibit second trimester abortions actually ban abortion outright and evidently lack constitutional safeguards for women's reproductive freedoms. Aligning the State's abortion law with that of foreign nations whose reproductive rights laws conflict with the dictates of our Constitution does not serve a valid state interest.[8]

Fifth, the State contends that the law promotes its interest in preventing fetal pain. We find little merit in this argument. Major medical organizations, including the American Medical Association, the American College of Obstetricians and Gynecologists, and the Royal College of Obstetricians and Gynecologists, have concluded that fetal pain is not even possible before at least 24 weeks LMP. Offering a less mainstream view, the State's expert, Dr. Malloy, testified that in her opinion a fetus can feel pain at 22 weeks LMP. But even if Dr. Malloy's opinion were credited, Plaintiffs do not perform abortions at this late time of gestation, and Texas already bans abortion after 22 weeks LMP except in extremely limited circumstances. *See* TEX. HEALTH & SAFETY CODE §§ 171.041-46. Further, the State has not adduced evidence

---

[8] The foregoing should not be construed to suggest that comparative-law perspective cannot serves useful and important functions. Indeed, we readily acknowledge that it can. *See, e.g.*, *Atkins v. Virginia. Texas*, 539 U.S. 304, 316 n.21 (citing international consensus against executing the "mentally retarded"). Here though, the State attempts to use foreign law in an invalid way by asserting that it has an interest in adjusting its laws to more closely reflect those of nations whose laws are incompatible with our fundamental charter.

that requiring doctors to induce fetal demise in utero would be more likely to prevent any purported fetal pain than permitting the D&E procedure without first ensuring fetal demise. The State thus has not demonstrated that SB8 actually advances any interest in preventing fetal pain.

## C.

Weighing SB8's significant burdens upon female patients against its nonexistent health benefits and any other limited benefits it may actually confer, it is clear that the law places a "substantial obstacle in the path of a woman seeking" a previability abortion.[9] *Casey*, 505 U.S. at 877. Based on the district court's findings—which are not clearly erroneous and to which we therefore must defer—the procedures proposed by the State to ensure compliance with SB8 are themselves substantial obstacles to D&E abortions, a procedure whose availability the Supreme Court has continually cited as essential to guaranteeing women's right to abortion care. *See Stenberg*, 530 U.S. at 938-39, 945-46 (2000); *Gonzales*, 550 U.S. at 153, 165. SB8, then, results in severe burdens as it would effectively prohibit the most common and safest method of abortions in Texas after 15 weeks LMP. And it would inflict a special hardship on low-income women who are often unable to obtain an abortion until this point in their pregnancy. On the other end of the scale are the State's interests advanced by SB8, which are minimal at most. We thus conclude that SB8's burdens substantially outweigh its benefits. The law therefore constitutes an undue burden on a woman's right to obtain

---

[9] The State objects to the district court's comment that an obstacle is substantial if it is "of substance." The State contends that this is an incorrectly lax description of the substantial-obstacle test. We need not pass on the district court's objected to single remark because it was not necessary to or employed in the district court's decision applying correct legal principles to plausible and permissible factual findings based on the record in this case.

a previability abortion and violates the Fourteenth Amendment. *See id.* at 877.

## V.

The State next contends that the district court erred in granting facial relief. "[A]n abortion restriction is facially invalid if in a large fraction of the cases in which it is relevant, it will operate as a substantial obstacle." *Jackson Women's Health Org.*, 945 F.3d at 275-76 (internal quotation marks omitted). "The relevant denominator" in this analysis consists of the class of "women for whom the provision is an actual rather than an irrelevant restriction." *Id.* (internal quotation marks omitted). That category is narrower "than all women, pregnant women, or even women seeking abortions identified by the State." *Id.* (internal quotation marks omitted). The district court determined that because SB8 affects every second trimester D&E procedure in Texas, the class of women for whom SB8 is a relevant restriction is all women between 15-20 weeks LMP who seek an outpatient second trimester D&E abortion. We agree. And the State does not contend otherwise.

We turn, then, to the numerator in this fraction: the portion of women seeking a D&E procedure between 15-20 weeks LMP for whom SB8 is a substantial obstacle. *See id.* SB8 compels *all* women seeking a D&E abortion during this gestational period to undergo an additional and otherwise unnecessary procedure to induce fetal demise. The procedures are dangerous, painful, invasive, and potentially experimental. And they expose all women to heightened risks of adverse health consequences, while offering no corresponding health benefit. Taken together, these burdens are substantial, exceed any minimal benefits from the law, and thus are undue. And because SB8 would subject all women seeking a D&E abortion after 15 weeks LMP to these undue burdens, SB8 operates as a substantial obstacle in a large fraction of cases in which it is relevant. *See Jackson Women's Health Org.*, 945 F.3d at

275-76. Indeed, the law imposes an undue burden on *every* Texas woman for whom it is an actual, rather than irrelevant, restriction.

In an effort to salvage SB8, the State argues that we should limit the scope of injunctive relief by enjoining only the law's unconstitutional applications while leaving intact its purportedly constitutional applications. We reject this argument for several reasons. First, as explained, the district court properly exercised its discretion in granting facial relief. Second, "it is not our role to rewrite an unconstitutional statute." *Jackson Women's Health Org.*, 945 F.3d at 277 n.50 (quoting *United States v. Stevens*, 559 U.S. 460, 481 (2010)); *see also Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) ("[M]indful that our constitutional mandate and institutional competence are limited, we restrain ourselves from rewriting state law to conform it to constitutional requirements[.]" (cleaned up)). Third, "we are without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Stenberg*, 530 U.S. at 944 (internal quotation marks omitted). The State offers no such construction, and we think no such construction is possible because, as explained in our large-fraction analysis, SB8 operates as an undue burden in all of its applications where it is a relevant restriction.

## VI.

For these reasons, we AFFIRM the judgment of district court.

Don R. Willett, *Circuit Judge*, dissenting:

Civilized society has long recognized that death and dignity should coincide. It's why we dress up for funerals and venerate the heroes of hospice and palliative care. It's why we derive comfort when we hear that a loved one died peacefully in their sleep; the loss, no less sorrowful, is leavened with solace knowing that someone dear to us didn't suffer. It's why babies born pre-viability receive medication to ease their passing. Human dignity should prevail even when—*especially* when—human life slips away.

Women who anguish over the decision to have an abortion understand this. In one medical study cited in the record, 92% of women undergoing the second-trimester method challenged here preferred that the unborn life in her womb be ended before being torn apart and extracted.[1] The process of death—how we die, and how agonizingly—matters. And this incontestable truth is why the State of Texas enacted Senate Bill 8 (SB8) in 2017 to limit what Texas law calls "dismemberment abortions," a method known more clinically, though less accurately, as Dilation and Evacuation (D&E). Texas does not seek to ban D&E outright; it seeks to make it less brutal and more humane.

The law is awash in coy euphemisms. The abortion-rights debate, and the attendant language wars, are emotionally charged, to be sure. But SB8 minces no words about what "dismemberment abortion" means for an unborn child's final moments. For its part, the district court offered just nine words: "The evidence before the court is graphic and distasteful." The panel majority follows a similar tack, camouflaging things in anodyne, sanitizing abstractions that conceal more than they reveal: "Because at 15 weeks LMP

---

[1] Sfakianaki et al., *Potassium Chloride-Induced Fetal Demise*, 33 Journal of Ultrasound in Medicine 2 (2014), https://pubmed.ncbi.nlm.nih.gov/24449738/.

the fetus is larger than the dilated cervical opening, the fetal tissue usually separates as the physician moves it through the cervix, resulting in fetal demise." This bit of linguistic sleight of hand is like saying *The Godfather* is about an immigrant who experiences bumps in the road while running the family olive oil business. Such cloudy vagueness deflects rather than describes.

If you had trouble deciphering the majority's mystifying sentence, let me peel away the lawyerly jargon.[2] The Supreme Court described the D&E procedure in gruesome "technical detail" in *Stenberg v. Carhart*, acknowledging that its description "may seem clinically cold or callous to some, perhaps horrifying to others."[3] As the Supreme Court explained, abortion doctors use D&E in the second trimester because at that stage of fetal development, "the fetus is larger"—"particularly the head"—and the "bones are more rigid," meaning "dismemberment or other destructive procedures" are required.[4] So, let me quote the Texas Health and Safety Code's description of a D&E abortion, which puts things rather bluntly:[5] A physician extracts from the womb what moments before had been a living "unborn child"—using forceps, scissors, or a similar instrument that

---

[2] "We will look th[e]se facts in the face, setting them out in language that does not obscure matters for people who, like us, are untrained in medical terminology." *W. Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310, 1319 (11th Cir. 2018), *cert. denied sub nom. Harris v. W. Alabama Women's Ctr.*, 139 S. Ct. 2606 (2019).

[3] 530 U.S. 914, 923 (2000).

[4] *Id.* at 925 (internal citation omitted).

[5] SB8 opts for non-medical terminology, using "dismemberment abortion" rather than "dilation and evacuation"; "unborn child" rather than "fetus" or "product of conception"; and "causing the death of an unborn child" rather than "fetal demise." Tex. Health & Safety Code § 171.151.

"slices, crushes, or grasps" fetal body parts one at a time. Piece by piece. Arm by arm. Leg by leg. And as the abortion doctor "cut[s] or rip[s] the piece from the body"—a torso, a spine, a rib cage—he places each body part on a tray (or in a dish) to keep inventory and ensure that nothing is left behind. Sometimes the heart is still beating on the tray. The fetus dies just as an adult experiencing corporal dismemberment would—by bleeding to death as his or her body is torn apart.

The majority opinion spurns what the Supreme Court has called the State's "legitimate and substantial interest in preserving and promoting fetal life"[6] as "minimal at most." Such breezy disregard is unserious. No constitutional right is absolute (even the categorically worded ones expressly enshrined in the Bill of Rights). Yet the majority takes the view that a woman's right to have an abortion has no end while the State's interest in recognizing fetal humanity has no beginning.

Rhetoric must not befog reason. The majority uses gauzy, evasive language to minimize the reality of D&E and to maximize, but never quantify, the risks of various "fetal-demise" techniques. The majority then relies on this imprecision to evade exacting analysis. But without fully understanding the procedures at issue, one cannot fully understand the State's asserted interest in reducing the barbarism of D&E on a living unborn child by requiring more humane alternatives—alternatives Plaintiffs have long used, and touted as safe, in their own provision of abortion services.

It merits repeating: The State of Texas is not seeking to ban this grisly procedure. But Texas does seek to unbrutalize it, requiring that an abortion doctor not dismember a living unborn child. SB8 does not proscribe D&E; it prescribes more humane D&E, one that substitutes merciful deaths for

---

[6] *Gonzales v. Carhart*, 550 U.S. 124, 145 (2007).

horrific ones. Few would disagree that tearing the limbs off a live fetus until it dies is more barbaric than tearing the limbs off a dead fetus, or injecting the fetus with a lethal substance first. Under SB8, developing human life must be extinguished before it is extracted, thus granting a measure of mercy and dignity to the unborn child's final moments. As explained below, there is nothing unconstitutional about that.

Respectfully, I dissent.

\* \* \*

The district court committed numerous reversible errors, scrutinizing SB8 under a now-invalid legal standard and making multiple clearly erroneous fact findings that disregard or distort the evidentiary record. Reversal is warranted for at least four reasons:

1. The controlling opinion of *June Medical Services LLC v. Russo* scrapped the benefits vs. burdens balancing test used by the district court (and endorsed by the panel majority).[7]

2. SB8 meets the correct legal standard: the three-decades-old "undue burden" test (whether a law poses a "substantial obstacle") from *Planned Parenthood of Southeastern Pennsylvania v. Casey*.[8]

3. Even under *Whole Woman's Health v. Hellerstedt*'s amorphous and now-defunct balancing test, SB8 passes constitutional muster.[9]

---

[7] 140 S. Ct. 2103 (2020).

[8] 505 U.S. 833 (1992).

[9] 136 S. Ct. 2292 (2016).

4. Plaintiffs failed to meet the heavy evidentiary burden of showing that SB8 is facially unconstitutional.

I

First, I explain why the controlling standard is Chief Justice Roberts's 2020 formulation in *June Medical* of the "undue burden" test from *Casey* rather than the 2016 *Hellerstedt* benefits vs. burdens balancing test.

In 2016, *Hellerstedt* invalidated a Texas statute that required abortion providers to have admitting privileges at local hospitals and to meet the minimum standards for ambulatory surgical centers.[10] The Court stated that *Casey*'s undue-burden test "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer."[11] Framing the inquiry this way, the Court then concluded that the district court properly "weighed the asserted benefits" of the challenged provisions "against the burdens."[12]

Just a few months ago in *June Medical*, the Supreme Court again tackled the meaning of "undue burden" in another admitting-privileges case. The restriction was similar to that in *Hellerstedt*, but the Court's reasoning was anything but. Critically, no rationale received majority support. While *Hellerstedt* garnered a clear five-vote majority for its benefits vs. burdens balancing approach, *June Medical* managed only a plurality. The Court fractured 4-1-4, with five votes agreeing on what to do, but only four agreeing on why to do it.[13] The four-Justice plurality repeated the *Hellerstedt* balancing approach, stating that the *Casey* undue-burden standard requires courts "to

---

[10] *Id.* at 2300.

[11] *Id.* at 2309.

[12] *Id.* at 2310.

[13] 140 S. Ct. at 2112.

weigh the law's asserted benefits against the burdens it imposes on abortion access."[14] But again, that decisional rule mustered just four votes.

Chief Justice Roberts provided a fifth vote for the result, but not for the reasoning. Writing for himself, the Chief Justice (who had dissented in *Hellerstedt*) concurred in the judgment but denounced the nebulous balancing of benefits and burdens. The on-target test, said the Chief Justice, harkening back to *Casey*, has a simpler formulation: "Laws that do not pose a substantial obstacle to abortion access are permissible, so long as they are 'reasonably related' to a legitimate state interest."[15]

In rejecting balancing, the Chief Justice insisted that trying to weigh the State's interest in protecting the potentiality of human life is absurd because it's impossible to "assign weight to such imponderable values."[16] He emphasized that "[n]othing about *Casey* suggested that a weighing of costs and benefits of an abortion regulation was a job for the courts."[17] Instead, *Casey* "focuses on the existence of a substantial obstacle."[18] Agreeing with the plurality's substantial-obstacle analysis (focusing on the law's burdens), Chief Justice Roberts said the inquiry should have ended there. "In neither [*Hellerstedt* nor *Casey*] was there [a] call for consideration of a regulation's benefits."[19] The only relevance of an abortion regulation's asserted "benefits," said the Chief Justice, is "in considering the threshold requirement that the State have a 'legitimate purpose' and that the law be

---

[14] *Id.* (internal quotation marks omitted).

[15] *Id.* at 2135 (Roberts, C.J., concurring).

[16] *Id.* at 2136.

[17] *Id.*

[18] *Id.*

[19] *Id.* at 2139.

'reasonably related to that goal.'"[20] And since we must apply "the 'traditional rule'" of deference to Texas's "medical and scientific" judgments,[21] this threshold requirement is satisfied if Texas has "a rational basis to . . . use its regulatory power."[22] And if the State makes that modest legitimate-interest showing, "the *only* question for a court is whether a law has the 'effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'"[23]

The majority opinion in this case defies the Chief Justice's controlling opinion in *June Medical* and instead clings to the *Hellerstedt* balancing test, the same balancing test that "five Members of the Court reject[ed]"— irrefutably—a few months ago.[24] Proper application of the *Marks* rule dictates otherwise.

How are lower courts to divine the legal rules of the road when no single rule of decision garners at least a five-Justice majority? There's a rule for that. And it is simply stated, if not applied. Forty-plus years ago in *Marks v. United States*, the Supreme Court instructed that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds."[25] In other words, the absence of a decisional rule doesn't mean the

---

[20] *Id*. at 2138 (quoting *Casey*, 505 U.S. at 878, 882).

[21] *Id*. at 2136 (quoting *Gonzales*, 550 U.S. at 163).

[22] *Gonzales*, 550 U.S. at 158.

[23] *June Medical*, 140 S. Ct. at 2138 (Roberts, C.J., concurring) (quoting *Casey*, 505 U.S. at 877) (emphasis added).

[24] *Id.* at 2182 (Kavanaugh, J., dissenting).

[25] 430 U.S. 188, 193 (1977) (internal quotation marks omitted).

absence of binding precedent. We have clarified that this principle "is only workable where there is some common denominator upon which all of the justices of the majority can agree."[26] If a concurrence "can be viewed as a logical subset" of the plurality, thus yielding outcome convergence, the concurrence controls.[27] And its precedential force is absolute: "The binding opinion from a splintered decision is as authoritative for lower courts as a nine-Justice opinion. . . . This is true even if only one Justice issues the binding opinion."[28]

The panel majority concludes that *Marks* is inapt because Chief Justice Roberts's concurrence in *June Medical* is not a logical subset of the plurality. The majority first notes that since Chief Justice Roberts rejected the balancing test, his concurrence is not "logically compatible" with the plurality opinion. The majority adds that even though the four dissenters in *June Medical* agreed with Chief Justice Roberts that the correct standard is "substantial obstacle"—not *Hellerstedt*'s balancing test—their cobbled-together dissents and his concurrence can't combine to form an opinion with any precedential force. The majority's arguments collapse under scrupulous analysis of *June Medical* and our caselaw on the proper application of *Marks*.

As a preliminary matter, the panel majority says that the views of the dissenting Justices in *June Medical* are irrelevant. But the *Marks* rule doesn't apply unless there is a fragmented opinion "*and* no single rationale explaining the result enjoys the assent of five Justices."[29] Dissenting in *June Medical*,

---

[26] *United States v. Duron-Caldera*, 737 F.3d 988, 994 n.4 (5th Cir. 2013) (internal quotation marks omitted).

[27] *Id.*

[28] *United States v. Duvall*, 740 F.3d 604, 611 (D.C. Cir. 2013) (Kavanaugh, J., concurring in the denial of rehearing en banc).

[29] *Marks*, 430 U.S. at 193 (emphasis added).

Justice Kavanaugh observed that "five Members of the Court reject the [*Hellerstedt*] cost-benefit standard."[30] Noting Justice Kavanaugh's statement, then, is no attempt to stitch together a holding between the dissenters and the concurring Chief Justice. Instead, it merely shows that the requirements for applying *Marks* are met here.[31] Only after making this determination can we ask: Is the Chief Justice's concurrence "a logical subset" of the plurality and decided "on the narrowest grounds" such that it is the controlling opinion? Short answer: Yes.

The *June Medical* plurality weighed the law's asserted benefits against its burdens on abortion access.[32] The plurality referred to the "burdens" side of the test as a "substantial-obstacle determination."[33] Devoting almost ten pages to this analysis, the plurality scrutinized the law's impact on abortion providers and abortion access more generally.[34] It then assessed the "law's asserted benefits," spending considerably less time (barely two pages) on this part of the balancing test.[35] The plurality concluded that the law "pose[d] a 'substantial obstacle' to women seeking an abortion" and "offer[ed] no significant health-related benefits."[36] Thus, the plurality decided "that the law consequently imposes an 'undue burden' on a woman's constitutional

---

[30] *June Medical*, 140 S. Ct. at 2182 (Kavanaugh, J., dissenting).

[31] Even aside from the application of *Marks*, Justice Kavanaugh's point calls into question the validity of the plurality's holding. *See Alleyne v. United States*, 570 U.S. 99, 120 (2013) (Sotomayor, J., concurring) ("A decision may be of questionable precedential value when a majority of the Court expressly disagreed with the rationale of a plurality." (cleaned up)).

[32] 140 S. Ct. at 2120.

[33] *Id.* at 2121–30.

[34] *Id.*

[35] *Id.* at 2130–32.

[36] *Id.* at 2132.

right to choose to have an abortion."[37] The plurality's test can be distilled to this formula: substantial obstacle + insignificant benefits = undue burden.

Now to Chief Justice Roberts's test. As explained below, his concurrence, the narrowest opinion concurring in the judgment, constitutes the Court's holding and provides the controlling standard. The Chief Justice says the proper rule under *Casey*, and the one he applies, is whether the law places "an undue burden on the woman's ability to obtain an abortion."[38] "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."[39]

After noting that the plurality recites these standards as well, the Chief Justice explains how the plurality diverges from his opinion and from *Casey*, by injecting benefits into the equation.[40] The Chief Justice goes on to emphasize that the undue burden test is about the "'substantial obstacle' standard," pointing to *Casey*'s use of that standard "nearly verbatim no less than 15 times."[41] In other words, the Chief Justice's test is: substantial obstacle = undue burden. The only difference between the plurality's formulation and that of the Chief Justice is the elimination of one variable from the left side of the equation. Indeed, the Chief Justice concludes that, "for the reasons the plurality explains," the law "imposed a substantial

---

[37] *Id.*

[38] *Id.* at 2135 (Roberts, C.J., concurring) (citing *Casey*, 505 U.S. at 877).

[39] *Id.* Conversely, a law regulating abortion that "serves a valid purpose" without imposing a substantial obstacle is constitutional, even if it "has the incidental effect of making it more difficult or more expensive to procure an abortion." *Casey*, 505 U.S. at 874.

[40] *June Medical*, 140 S. Ct. at 2135 (Roberts, C.J., concurring) (citing *Casey*, 505 U.S. at 877).

[41] *Id.* at 2138.

obstacle" on abortion access.[42] In short, the Chief Justice's test is a narrower version of the plurality's test and thus a logical subset of it.

For the math-inspired, an illustration may prove helpful:



The larger circle (B) is the *June Medical* plurality's "grand 'balancing test'" to determine undue burden.[43] The subset (A) is the Chief Justice's narrower test, which focuses only on half of the plurality's test: the burden part. Simply put, the tests have a common denominator—substantial obstacle—and the Chief Justice's agreement with the plurality's substantial-obstacle analysis is the "narrowest position supporting the judgment."[44]

---

[42] *Id.* at 2141.

[43] *Id.* at 2135.

[44] *Whole Woman's Health v. Cole*, 790 F.3d 563, 571 (5th Cir.), *modified*, 790 F.3d 598 (5th Cir. 2015), *rev'd and remanded sub nom. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), *as revised* (June 27, 2016), *and rev'd and remanded sub nom. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), *as revised* (June 27, 2016) (applying *Marks* to find that the joint opinion in *Casey* was controlling).

Even if you consider the two tests substantially different, as the majority does, because only one (the plurality's) is a balancing test, these differences in type do not preclude the application of *Marks*. That's because the types of tests say nothing about the tests' commonalities. Our decision in *United States v. Duron-Caldera*, relied on by the panel majority for inapposite reasons, confirms this conclusion.[45]

In *Duron-Caldera*, the government argued that to determine whether an affidavit was testimonial, we should apply the primary purpose/accusation test from the plurality opinion in *Williams v. Illinois*.[46] In *Williams*, Justice Alito, writing for the plurality, stated that an out-of-court statement is testimonial when it has "the primary purpose of accusing a targeted individual of engaging in criminal conduct."[47] Justice Thomas, concurring in the judgment, rejected the primary-purpose test, as modified by Justice Alito, *in its entirety*. "The shortcomings of the original primary purpose test pale in comparison, however, to those plaguing the reformulated version that the plurality suggests today. The new primary purpose test . . . lacks any grounding in constitutional text, in history, or in logic."[48]

Justice Thomas proposed a completely different test—the "indicia of solemnity" test, which asks whether out-of-court statements are "formalized testimonial materials, such as depositions, affidavits, and prior testimony, or statements resulting from formalized dialogue, such as custodial interrogation."[49] Justice Thomas based his concurrence in the judgment on

---

[45] 737 F.3d at 994–96.

[46] 567 U.S. 50 (2012).

[47] *Williams*, 567 U.S. at 82.

[48] *Id.* at 114 (Thomas, J., concurring).

[49] *Id.* at 111 (internal quotation marks omitted).

the result of the indicia of solemnity test, expressly acknowledging that the plurality "forg[oes] that approach" and instead applies the primary purpose/accusation test.[50] In short, Justice Thomas's test has absolutely nothing in common with the plurality's primary purpose/accusation test; he just happened to reach the same result.

Because of this lack of commonality, we refused (in *Duron-Caldera*) to find the primary purpose/accusation test controlling, noting that neither the plurality nor the concurrence could "be viewed as a logical subset of the other."[51] We concluded that *Marks* didn't apply because there was no "'narrowest' holding that enjoys the support of five Justices."[52]

Our nonapplication of *Marks* there supports the application of *Marks* here. In *June Medical*, the Chief Justice does not reject the plurality's test in its entirety. Instead, he adopts the plurality's "substantial obstacle" analysis, which takes up most of the plurality's opinion.[53] After agreeing with that analysis, he concludes that "finding a substantial obstacle before invalidating an abortion regulation is therefore a sufficient basis for the decision."[54] He only rejects the plurality's "added . . . observation" concerning the weighing of "the law's asserted benefits."[55] In other words, remove the few pages of the plurality's "benefits" analysis, and the Chief Justice is on board with the opinion. The Chief Justice's *June Medical* concurrence, then, is both a subset of, and a narrower holding than, the plurality opinion.

---

[50] *Id.* at 118.

[51] 737 F.3d at 994 n.4.

[52] *Id.*

[53] *June Medical*, 140 S. Ct. at 2139 (Roberts, C.J., concurring).

[54] *Id.*

[55] *Id.* at 2135.

There are still more reasons to apply the Chief Justice's "substantial obstacle" test here. Legal clashes have erupted nationally over the vexing interplay between *Marks* and *June Medical*. But notably, the panel majority in this case collides head-on with the two other circuits to have considered the issue.[56] The Eighth Circuit barely two months ago and the Sixth Circuit just last week both held that Chief Justice Roberts's concurrence in *June Medical* constitutes the Court's controlling opinion because he joined the judgment on the narrowest grounds.[57]

Indeed, the Supreme Court's own docket activity immediately following *June Medical* underscores the correctness of the Sixth and Eighth Circuits' interpretation. On the heels of *June Medical*, the Court directed the Seventh Circuit to reconsider two decisions that had applied a balancing test.[58] Sending these cases back "for further consideration in light of" *June Medical*, instead of simply denying review, suggests the High Court rejected

---

[56] *Hopkins v. Jegley*, 968 F.3d 912 (8th Cir. 2020); *EMW Women's Surgical Center, P.S.C.* v. *Friedlander*, No. 18-6161, 2020 WL 6111008 (6th Cir. Oct. 16, 2020).

[57] *Id.* The only district court to consider this issue has come to the opposite conclusion even though it admits that a showing of substantial obstacle "is a 'common denominator'" among the plurality and concurrence. *Am. Coll. of Obstetricians & Gynecologists v. United States Food & Drug Admin.*, No. 20-1320, 2020 WL 3960625, at *16 (D. Md. July 13, 2020). The United States moved to stay the district court's injunction, noting that "every Justice of th[e] Court stressed the importance of demonstrating that a law poses a substantial obstacle to abortion access in order to obtain relief. And at least five Justices explicitly rejected the balancing test that the district court here adopted." No. 20A34, Application for Stay in *Am. Coll. of Obstetricians & Gynecologists v. United States Food & Drug Admin.*, No. 20-1320, 2020 WL 3960625 (D. Md. July 13, 2020) (internal citations omitted). The Government further argues that any "discussion of benefits in [*Hellerstedt*] was not necessary to its holding," so the Chief Justice's concurrence in *June Medical* applies the only relevant test (substantial obstacle). *Id.*

[58] *Box v. Planned Parenthood of Indiana & Kentucky, Inc.*, No. 18-1019, 2020 WL 3578669, at *1 (July 2, 2020); *Box v. Planned Parenthood of Indiana & Kentucky, Inc.*, No. 19-816, 2020 WL 3578672, at *1 (July 2, 2020).

a balancing test and expects the Seventh Circuit to apply the more lenient undue-burden framework outlined in the Chief Justice's concurrence.

As middle-management circuit judges, we cannot overrule the Supreme Court. But neither should we "underrule" it. "Our duty is to harmonize its decisions as well as possible."[59] There is admitted awkwardness in treating as precedential an opinion that no one else joins, even one authored by the Chief Justice of the United States. But this is the settled practice when that opinion is the determinative one.[60] Indeed, the Chief Justice's concurrence is the only opinion that attempts to synthesize *Casey*, *Hellerstedt*, and *June Medical*. "Nothing about *Casey* suggested that a weighing of costs and benefits of an abortion regulation was a job for the courts," and courts should "respect the statement in [*Hellerstedt*] that it was applying the undue burden standard"—that is, the substantial-obstacle test "of *Casey*."[61]

The controlling opinion in *June Medical* clarified that the "undue burden" standard leaves no room for benefits vs. burdens balancing. Nor does it envision judges as legislators, making quintessential value-laden policy judgments. The panel majority wrongly holds otherwise, endorsing the district court's free-form balancing analysis. Even so, as explained in the following sections, SB8 passes constitutional muster under either standard: (1) *Casey*'s governing "undue burden" test, and (2) *Hellerstedt*'s now-defunct grand balancing test.

---

[59] *Nelson v. Quarterman*, 472 F.3d 287, 339 (5th Cir. 2006) (Jones., C.J., dissenting on other grounds).

[60] *Marks*, 430 U.S. at 193.

[61] *June Medical*, 140 S. Ct. at 2136, 2138 (Roberts, C.J., concurring).

## II

A forthright application of *Casey*'s principles and progeny underscores the constitutionality of SB8. It is reasonably related to a legitimate state interest and imposes no substantial obstacle.

### A

*Casey* represented a fundamental shift in abortion jurisprudence and set forth the undue-burden test. The *Casey* plurality explicitly rejected the post-*Roe v. Wade* line of cases that ignored the State's "important and legitimate interest" in fetal life and that invalidated abortion restrictions "which in no real sense deprived women of the ultimate decision" to obtain an abortion.[62] "Only where [a] state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach" the abortion right.[63] The *Casey* plurality further explained: "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."[64]

After *Casey*, the Supreme Court decided *Stenberg v. Carhart* and *Gonzales v. Carhart*, both involving the constitutionality of statutes banning D&E abortions.

In *Stenberg*, the Court struck down a Nebraska statute that in effect banned both D&E procedures (intact and dismemberment) without a health exception for the mother.[65] Dismemberment D&E is the procedure

---

[62] *Casey*, 505 U.S. at 871, 875.

[63] *Id.* at 874.

[64] *Id.* at 877.

[65] *Stenberg*, 530 U.S. at 945–46.

challenged in this case, and intact D&E (also called D&X) is a procedure in which the abortion provider extracts the fetus intact, "pull[ing] the fetal body through the cervix [and] collap[sing] the skull."[66] The Court discussed at length whether a maternal-health exception was necessary (it held it was) and whether the statute's language was broad enough to cover both types of D&E procedures (it held it was).[67] The Court specifically noted there was record evidence that intact D&E was sometimes safer for the pregnant woman than dismemberment D&E.[68] But the parties' experts disagreed about "whether [intact D&E] is generally safer."[69]

Seven years later, in *Gonzales*, the Court upheld the federal Partial-Birth Abortion Ban Act, which banned "intact D&E."[70] The Court, as in *Stenberg*, did not mask the procedure's gruesomeness. It explained that once the baby's body is in the birth canal, sometimes with limbs completely outside of the mother's body (when the baby is feet first), the doctor "forces [] scissors into the base of the skull . . . [then] introduces a suction catheter" to "evacuate the skull contents."[71]

Before reaching its decision, the Court laid out the three holdings of *Casey*: (1) the woman has a right to choose to have an abortion before viability without undue interference from the State; (2) the State has the power to restrict abortions after fetal viability; and (3) the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and

---

[66] *Id.* at 927.

[67] *Id.* at 930–46.

[68] *Id.* at 936.

[69] *Id.* at 936–37.

[70] *Gonzales*, 550 U.S. at 137.

[71] *Id.* at 138.

the life of the fetus.[72] The Court then repeated *Casey*'s undue-burden standard: An undue burden exists "if a regulation's 'purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'"[73] This test was not a balancing test, but it "struck a balance" between the woman's right to an abortion and the State's ability to "express profound respect for the life of the unborn."[74]

The Court concluded that the Partial-Birth Abortion Ban Act did not impose an undue burden on second-trimester abortions, as a facial matter, because the act excluded most D&Es (the dismemberment procedure), and it furthered the government's interests. "Implicitly approving such a brutal and inhumane procedure by choosing not to prohibit it will further coarsen society to the humanity of not only newborns, but all vulnerable and innocent life, making it increasingly difficult to protect such life."[75] The Court concluded that the case presented an inappropriate facial challenge. As-applied challenges were "the proper manner to protect the health of the woman if it can be shown that in discrete and well-defined instances a particular condition has or is likely to occur in which the procedure prohibited by the Act must be used."[76] The Court further noted that "[i]n an as-applied challenge the nature of the medical risk can be better quantified and balanced than in a facial attack."[77]

---

[72] *Id.* at 145.

[73] *Id.* at 146 (quoting *Casey*, 505 U.S. at 878).

[74] *Id.*

[75] *Id.* at 157.

[76] *Id.* at 167.

[77] *Id.*

The majority opinion ignores the principles of these cases and the constitutional analysis they employed.

B

First, the majority turns the clock back to the pre-*Casey* days where state interests in fetal life were minimized to the point of nonexistence. Indeed, the majority opinion calls the State's interest in banning live-dismemberment abortions "minimal at most." In doing so, it blesses the district court's dismissive finding that the State's interest in fetal life is "only marginal," while the woman's right to an abortion is "absolute." The district court stated that "[t]he State's legitimate concern with the preservation of the life of the fetus is an interest having its primary application once the fetus is capable of living outside the womb." But this flatly contradicts *Casey*'s holding, repeated in *Gonzales*, "that the State has legitimate interests *from the outset of the pregnancy* in protecting the health of the woman and the life of the fetus that may become a child."[78]

Next, the majority concludes that SB8 constitutes a substantial obstacle because it amounts to a de facto ban on D&E abortions—the most common abortion procedure in the second trimester. The majority believes that *Stenberg* and *Gonzales* stand for the proposition that where a statute "effectively ban[s] the safest, most common method of second trimester abortion," that statute "imposes an undue burden." And because the majority believes the fetal-demise techniques proposed by Texas are not feasible or safe, it holds that SB8 amounts to a complete ban on D&E abortions.[79]

---

[78] *Gonzales*, 550 U.S. at 145 (quoting *Casey*, 505 U.S. at 846) (emphasis added).

[79] The majority and Plaintiffs also rely on *Planned Parenthood of Cent. Missouri v. Danforth*, 428 U.S. 52 (1976) for this proposition. But *Danforth* is easily distinguished. In

The majority and Plaintiffs view one particular sentence in *Gonzales* as controlling here: "The Act excludes most D&Es in which the fetus is removed in pieces, not intact."[80] This cherry picking ignores the Court's analysis as a whole. And the conclusion rests on the false premise that SB8 amounts to a ban on the D&E procedure. It does not.

C

SB8 only bans D&E if fetal demise is not feasible. Before getting into whether it is, it's important to understand the D&E procedure.

The second trimester spans from 13–26 weeks of gestation. Texas law bans abortions after 22 weeks' gestation unless the abortion is necessary to protect the woman's health or the fetus has a severe abnormality.[81] After 15 weeks, the D&E procedure is the most common abortion method. So SB8 only affects abortions between 15–22 weeks, which makes up about 8% of total abortions in the U.S.[82] And the trend is toward fewer second-trimester

---

that case, the Supreme Court assessed numerous state restrictions on abortion, including a ban on saline amniocentesis, which at the time affected "all abortions after the first trimester." *Id.* at 76. The state enacted the ban "on the ground that the technique 'is deleterious to maternal health." *Id.* But the Court found that the ban was not "reasonably relate[d]" to this interest and was instead "an unreasonable or arbitrary regulation designed to inhibit, and having the effect of inhibiting, *the vast majority* of second-trimester abortions." *Id.* at 79 (emphasis added). Here, the State asserts interests in fetal life and the integrity and ethics of the medical profession. There is undoubtedly a rational relation between these interests and banning a doctor from tearing a live unborn child apart. Plus, as explained below, Plaintiffs have failed to quantify even an estimate of how many abortions they believe SB8 will inhibit, much less that SB8 inhibits a *vast majority* of them.

[80] *Gonzales v. Carhart*, 550 U.S. at 151.

[81] Tex. Health & Safety Code §§ 171.044, .046.

[82] Centers for Disease Control and Prevention, *CDCs Abortion Surveillance System FAQs*, https://www.cdc.gov/reproductivehealth/data_stats/abortion.htm.

abortions. Between 2007 and 2016, the percentage of abortion before 8 weeks rose by 113%.[83]

In the small percentage of overall abortion cases where D&E is used, this is the process: The abortion doctor first provides the mother with the option of sedation. After sedation, the doctor administers a local anesthetic (usually lidocaine) using a 22-gauge needle inserted into the cervix. The doctor then begins the dilation process, using osmotic dilators that absorb liquid and expand the cervix. The process can take up to two days and may require additional drugs to aid dilation. Once the cervix is sufficiently dilated, the doctor starts extracting the unborn child—first using suction then forceps.[84] Forceps are necessary to remove what suction cannot—usually the head and spine. At later gestational ages, forceps with bigger and sharper teeth are often used to remove the body.

Before 17 weeks' gestation, suction will remove most of the unborn child, so suction is the cause of death. SB8 doesn't ban suction, even when forceps are required to remove any remaining pieces of the unborn child or other pregnancy tissue. Suction can sometimes be a one-day procedure, but depending on how effective the administered drugs are at dilation, the woman may have to return the following day.

After 17 weeks' gestation, suction is usually insufficient because the unborn child is more developed and too large to be suctioned out of the

---

[83] *Id.*

[84] Plaintiffs purposefully obscure this fact by selling D&E as a "ten-minute" procedure. This is refuted by the record. Indeed, Plaintiffs' record support for this is the district court's opinion that noted the *evacuation* phase "takes approximately ten minutes." Plaintiffs selectively ignore that dilation, especially at later gestational ages can take up to two days. In fact, Plaintiffs' own documents show that the dilation portion of the D&E can be a two- or even three-day process.

woman's body. So an abortion doctor causes fetal death by dismemberment or by alternative methods, including those described below, before dismembering the fetus. SB8 requires doctors to take the second path: death by alternative methods before the unborn child is torn apart.

The D&E procedure carries risks, including hemorrhage, uterine perforation or laceration, infections, failed abortion, amniotic fluid embolism, cervical incompetence, Asherman Syndrome, hysterectomy, cardiac arrest, and death. Many of these risks are rare, although the record shows that others are not quantifiable. Even with these risks, Plaintiffs consider D&E "extremely safe." Doctors might not perform D&Es on certain women with high-risk factors, such as cardiac issues, placenta accrete, hypertension, uncontrolled diabetes, obesity, or severe anemia.

For those women who do get a D&E abortion, SB8 requires fetal demise before the unborn child is dismembered. The State proposes three fetal-demise methods (though there are others) that abortion providers can use to comply with SB8: digoxin, potassium chloride, and umbilical-cord transection. The majority deems these techniques unfeasible because they are "risky," "medically unnecessary," and "experimental." I'll defer to the majority's descriptions of these methods but want to discuss the medical risks and feasibility of the procedures one by one.

1. Digoxin

The majority concludes that the district court committed no error in finding that digoxin injections "are not a safe and feasible method of inducing fetal demise." No fair reading of the record supports this conclusion.

First, the majority focuses on the possibly "experimental" nature of digoxin. But two decades ago, in *Stenberg*, the Supreme Court noted that "[s]ome physicians use intrafetal potassium chloride or digoxin to induce

fetal demise prior to a late D & E (after 20 weeks), to facilitate evacuation."[85] Seven years later, in *Gonzales*, the Supreme Court again acknowledged that "[s]ome doctors, especially later in the second trimester, may kill the fetus a day or two before performing" the D&E.[86] In fact, the court in *Gonzales* found that "an injection that kills the fetus" allows a doctor to perform the D&E without violating the Partial-Birth Abortion Ban Act.[87] The use of digoxin to cause fetal demise before a D&E is hardly a novel, much less "experimental," phenomenon.

Plaintiffs know this because they have used—and continue to use—digoxin. After *Gonzales*, abortion providers consistently used fetal-demise techniques to comply with the ban on partial-birth abortion. Planned Parenthood Federation of America even mandated that its affiliates use digoxin to cause fetal demise before D&E abortions at or after 18 weeks' gestation. If a woman declined digoxin, Planned Parenthood affiliates had to refer the woman to another abortion provider. All but one abortion provider that testified at trial had used digoxin in the past. The one who had not works with doctors who have. One Planned Parenthood affiliate previously used digoxin in all abortions in the second trimester. And the National Abortion Federation's 2018 Clinical Policy Guidelines for Abortion Care discuss both digoxin and potassium chloride (as well as lidocaine)—stating that each "may be used to cause fetal demise" in second-trimester abortions.

Texas providers also use, and some even *require*, digoxin to cause fetal demise. Plaintiff Alamo requires digoxin for abortions starting at 18 weeks' gestation. And Plaintiff Southwestern requires digoxin starting at 20 weeks'

---

[85] *Stenberg*, 530 U.S. at 925.

[86] *Gonzales*, 550 U.S. at 136.

[87] *Id.* at 164.

gestation. Plaintiffs bury their response to this point in a footnote in their brief, claiming that Planned Parenthood of Greater Texas no longer requires digoxin—its use starting at 18 weeks is now optional. One abortion doctor from Planned Parenthood of Greater Texas testified that she stopped using digoxin in consultation with an attorney who thought its use might violate another Texas law. When asked how she felt about not using digoxin anymore, she responded that she was "okay with it" because she "was comfortable with performing [D&E] both with and without digoxin." Whether digoxin is required or optional, the point is that Plaintiffs have used—and continue to use—digoxin to cause fetal demise. Yet in this litigation they claim that digoxin is unsafe and experimental.

Second, the majority focuses on the risks of digoxin. Plaintiffs first claim digoxin is not a feasible method of demise because it's invasive and painful. But Plaintiffs ignore that patients undergoing D&E are given the option of sedation even when digoxin is not administered. And Plaintiff Wallace admitted in testimony that when he performs an abortion involving digoxin, he injects a local numbing anesthetic before injecting the digoxin.

Plaintiffs next argue that digoxin presents significant risks and is contraindicated for women with certain heart conditions. And Plaintiffs state that for obese women or women with fibroids, administering digoxin is "difficult or impossible." Plaintiffs ignore that their own documents state that obese women and women with fibroids are considered to have "special conditions requiring special evaluation and management" for the D&E itself. In other words, the conditions that Plaintiffs argue make digoxin injections unsafe also make D&E unsafe. And it's unclear whether certain women with these conditions may get a D&E abortion at all.

Plaintiffs never quantify any of digoxin's risks. Instead, they argue that the mere existence of these risks renders the procedure unsafe. But Plaintiffs'

own consent forms for digoxin tell the patient that it's safe. Plaintiff Alamo's consent form goes so far as to say that starting at 18 weeks' gestation, "the abortion process is made easier and *safer* by injecting the fetus with a medication called Digoxin." And Planned Parenthood of Greater Texas's consent form says "[s]tudies have shown that it is safe to use digoxin" for an abortion.

Third, the majority claims that digoxin has a 5–10% failure rate. This is the only quantified "risk" in the entire opinion. But the record doesn't support the statistic. Plaintiffs' testifying expert who offered this statistic said he derived it from medical literature in general, without ever specifying what literature he relied on. Plaintiffs admit, without quantifying, that the rate is lower than 5–10% for intrafetal injection. Plaintiff Southwestern Women's Surgery Center's "Consent for Digoxin Injection" states in unequivocal terms that failure to cause fetal demise "is uncommon and may or may not delay the expected completion time of your abortion procedure."

Plaintiffs also turn a blind eye to their own documents showing that digoxin can be administered a second time, which undermines the 5–10% failure rate. They say "repeat injections are unstudied" and "nothing short of experimentation." Yet their own protocol documents say that "[i]f fetal demise has not been induced, a second injection of Digoxin can be administered at the physician's discretion."

Fourth, the majority claims that digoxin injections (and all fetal-demise procedures) are medically unnecessary. But Planned Parenthood of Greater Texas's consent form for digoxin says it "helps the clinician comply with a federal abortion law." Plaintiffs feel comfortable using digoxin not just for medical reasons, but for legal reasons too. Indeed, Plaintiffs themselves administer digoxin to avoid legal liability in the event of an accidental live

birth. It seems that digoxin is safe when avoiding tort exposure but unsafe when trying to avoid SB8.[88]

Finally, the majority claims that causing fetal demise through digoxin (and the other methods) will delay a woman's abortion procedure for what "otherwise is a one-day procedure." Yet Plaintiffs' own documents state that fetal demise is required at certain gestational ages, and that the required fetal-demise procedure between 20–21 weeks using digoxin is a "two- or three-day procedure." Further, the record shows that digoxin can work within hours.

Given this mountain of evidence, it's unsurprising that several of Plaintiffs' testifying doctors admitted digoxin was safe and widely used. The panel majority concludes, however, that despite Plaintiffs' own continued use of digoxin, the drug has all of a sudden become dangerous and experimental. If this is supported by the record, then Plaintiffs have been willfully endangering their patients for a long time.

2. Potassium Chloride

Compared to digoxin, there is less record evidence about potassium chloride. The record does contain, however, expert testimony and medical literature indicating it's a safe and effective way to cause fetal demise before dismemberment. One doctor testified about a medical study of the use of potassium chloride in 239 patients. The drug had a 100% efficacy rate.

The majority's main contention with potassium chloride is that it requires a specialist. There is record evidence to dispute this. But even so,

---

[88] In any event, SB8 has a health-and-safety exception that allows live dismemberment when medically necessary. TEX. HEALTH & SAFETY CODE §§ 171.002(3), 171.152(a).

the majority apparently equates needing a specialist with substantial obstacle. It provides no authority for this argument.

Plaintiffs also make the broad claim that no Texas abortion provider has ever injected potassium chloride to cause fetal demise. But their support for this proposition is the testimony of several doctors who said only that they had not personally used potassium-chloride injections. Plaintiffs point to no testimony or other record evidence that shows *no* Texas abortion provider has used potassium chloride or that it's not feasible for any provider to do so.

3. Umbilical-Cord Transection

The majority agreed with the district court's conclusion that umbilical-cord transection was "essentially experimental." But both Planned Parenthood Federation of America and Planned Parenthood of Greater Texas include in their clinical guides umbilical-cord transection as an option for their physicians to comply with the federal Partial-Birth Abortion Ban. The record also shows that some of Plaintiffs' doctors have performed this procedure, and one study of over 400 patients showed that umbilical-cord transection achieved fetal demise safely and easily 100% of the time. The study recommended that doctors use umbilical-cord transection over digoxin, and the doctors in the study used the technique for every patient they had over 16 weeks' gestation.

Plaintiffs dismiss this study as having "severe limitations." But their record cites for this argument are a doctor's discussion of potassium-chloride injections (not umbilical-cord transection) and another doctor's testimony that actually defended the study's strength. The only record cite Plaintiffs invoke that arguably supports their point is one of their witness's testimony that the study was "retrospective" and "not generalizable to the entire D&E providing community." Right after making this statement, the court cut off the witness from answering the attorney's next question about umbilical-cord

transections because it didn't "seem like [the witness] has experience in this area."

*     *     *

In sum, the district court erred in wholly disregarding substantial portions of the record and failing to acknowledge that Plaintiffs' own documents contradict their arguments about the risks of fetal-demise methods. Plus, the district court concluded that these methods were risky even though not a single risk was ever quantified.

The majority also focuses on the possible risks and side effects of all three techniques. But the mere existence of side effects, even severe ones, says little (if anything) about the procedures' safety. Anyone who has watched a drug commercial for something as benign as Zyrtec knows how the ad rattles off an ominous, rapid-fire list of potential side effects. It is the probability of these side effects occurring that matters. And Plaintiffs have failed to show that the probability is high enough to render any of these methods unsafe. The State, by contrast, offers actual empirical data about the risks here. In the past five years, there have been zero reports of complications from fetal-demise procedures. Zero.

In light of the record, the district court (and the panel majority) erred by finding that the three fetal-demise procedures discussed above are unsafe or unfeasible. Plaintiffs may not *want* to perform fetal-demise procedures before dismembering unborn children. But the Supreme Court is disinclined to such disinclination: "Physicians are not entitled to ignore regulations that direct them to use reasonable alternative procedures. The law need not give abortion doctors unfettered choice in the course of their medical practice, nor should it elevate their status above other physicians in the medical

community."[89] So long as the State doesn't substantially burden the abortion decision, its authority to ensure respect for unborn human life trumps the ability of abortion doctors "to choose the abortion method he or she might prefer."[90] In other words, if Texas exercises its regulatory power to moderate abortion procedures that devalue unborn life, the medical profession must give way and "find different and less shocking methods to abort the fetus in the second trimester, thereby accommodating legislative demand."[91]

---

[89] *Gonzales*, 550 U.S. at 163. Plaintiffs cite an Eleventh Circuit case striking down Alabama's ban on live-dismemberment abortions. *W. Alabama Women's Center v. Williamson*, 900 F.3d 1310, 1319 (11th Cir. 2018), *cert. denied sub nom. Harris v. W. Alabama Women's Ctr.*, 139 S. Ct. 2606 (2019). I am unpersuaded. The statutes are different, and the records are different. *Williamson* involved a truncated preliminary injunction record that included just one state-called witness. *See W. Alabama Women's Ctr. v. Miller*, 217 F. Supp. 3d 1313, 1339 (M.D. Ala. 2016). The record evidence in this case is markedly more developed and flatly contradicts the Alabama record in critical respects. Here, the district court held a five-day bench trial with dozens of witnesses and hundreds of exhibits. Even so, the smaller record in the Alabama case quantified the number of women impacted by the law, including the exact number of low-income women who seek abortions at the two abortion clinics in the state. *Id.* And the district court noted that not all doctors in Alabama are trained to perform the standard D&E, so finding any doctors willing to provide abortions in Alabama is difficult. *W. Alabama Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244, 1284 (M.D. Ala. 2017), *aff'd sub nom. W. Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310 (11th Cir. 2018). The district court found that requiring doctors to learn not only D&E but also the fetal-demise techniques would result in a substantial obstacle. *Id.* Plaintiffs here point to no similar evidence in the record. The record evidence in this case includes significant evidence to contradict the Eleventh Circuit's conclusion that alternatives to live dismemberment were not "safe, effective, or available." Finally, the most significant difference is that the Alabama district court found the fetal-demise law unconstitutional "as applied to the plaintiffs"—not on its face. *Id.* at 1289. Plaintiffs here argue SB8 is facially unconstitutional. In sum, I do not find convincing Plaintiffs reliance on non-binding cases dependent on different factual records.

[90] *Gonzales*, 550 U.S. at 158.

[91] *Id.* at 160.

Also jarring: The district court held that "adding an additional step to an otherwise safe and commonly used procedure" (ensuring fetal death before dismemberment) creates an undue burden "in and of itself." This is a glaring misreading of governing Supreme Court precedent. As the Court expressly observed in *Gonzales*, "an injection that kills the fetus"—one of the "fetal demise" methods that Texas urges here—"is an alternative . . . that allows the doctor to perform the [partial-birth abortion] procedure."[92] Why would such an injection be a constitutionally viable "alternative" for one type of D&E procedure but not another? The premise of *Gonzales* controls here: The fact that SB8, which serves a valid purpose, "one not designed to strike at the right itself," has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it."[93]

Because the record doesn't support the finding that abortion doctors cannot safely cause fetal demise before dismemberment, SB8 is not a de facto ban on D&E abortions. Thus, it's not an undue burden and not unconstitutional. This is true under the controlling test from *Casey*. But, as I'll discuss next, even if *Hellerstedt*'s nebulous balancing test applies, SB8 still stands.

## III

Even assuming the now-defunct balancing test applies, the district court incorrectly applied it. The balancing test requires courts to "weigh the

---

[92] *Id.* at 164; *see also id*. at 136 ("Some doctors, especially later in the second trimester, may kill the fetus a day or two before performing the surgical evacuation. They inject digoxin or potassium chloride into the fetus, the umbilical cord, or the amniotic fluid.").

[93] *Id*. at 157–58 (*quoting Casey*, 505 U.S. at 874) (alteration omitted).

law's 'asserted benefits against the burdens' it imposes on abortion access."[94]

But the district court stated that it weighed the abortion right against the State's interest—not the law's benefits against its burdens. The court claimed, as a categorical matter, that the abortion right is "absolute" and "dominant over" the state's interests. In other words, there's a permanent thumb (or anvil) on the scale, and no regulation can stand.

In applying this invented standard, the district court brushed off the State's legitimate interests in fetal life and medical-profession ethics as "marginal." Instead, it replaced the interests on the benefits side of the scale with maternal health, finding that SB8 doesn't further women's health. But the State didn't assert this interest. The district court ignored that the Supreme Court specifically weighed health benefits against burdens in *Hellerstedt* and *June Medical* because the state's asserted interest in those cases was "protecting women's health."[95]

By ignoring the State's interests here, the district court misapplied not only *Hellerstedt* and *June Medical* but also *Casey* and *Gonzales*. *Casey* established a state's legitimate interest in fetal life from "the outset of the pregnancy."[96] And *Gonzales* found the government's interest in fetal life and medical ethics both legitimate and furthered by a ban on a brutal and inhumane abortion procedure.[97]

---

[94] *June Medical*, 140 S. Ct. at 2112.

[95] *Id.* (discussing the state interests in *Hellerstedt* and *June Medical*).

[96] *Casey*, 505 U.S. at 846.

[97] *Gonzales*, 550 U.S. at 157–60.

The majority opinion admits that the district court made no findings about whether SB8 furthers the State's interest in respecting unborn life. It's worth stopping and emphasizing this point: The majority concedes that the district court gave no weight to the State's interest. So, again, it's entirely unclear how the district court was balancing anything.

Regardless, the majority purports to weigh—but, in reality, disposes of—the State's interests.

First, the majority assumes SB8 "provides a limited benefit" in respecting fetal life. Ironically, the majority appears to find the benefit "limited" because SB8 doesn't "purport to" ban D&E altogether. Plaintiffs make a similarly illogical argument on appeal by stating that there is no "relevant distinction between emptying the uterus" (removing the unborn child) via suction or forceps. "The fetus, which is alive at the beginning of the evacuation process, is no longer alive upon completion of both procedures." So, according to Plaintiffs, banning the use of forceps to dismember the unborn child, and not suction, doesn't "further the State's interest in potential life." These arguments, aside from their disturbing callousness, ignore *Gonzales*'s statement that "[t]here would be a flaw in this Court's logic, and an irony in its jurisprudence, were we first to conclude a ban on both D & E and intact D & E was overbroad and then to say it is irrational to ban only intact D & E because that does not proscribe both procedures."[98] Banning live-dismemberment abortions undoubtedly furthers the State's interest in fetal life. And given the graphic nature of live dismemberment, this interest merits weight.

SB8 also furthers the State's interest in fetal life because of the medical uncertainty as to when a fetus can feel pain. Some evidence indicates

---

[98] *Id.* at 160.

that a fetus can feel pain as early as 15 weeks. At the trial below, a neonatologist at Northwestern University testified that some of the behavioral markers of pain observed in fetuses include "[g]rimacing, crying in utero, kicking, kind of moving away from noxious stimuli." Recognizing this potential for feeling pain, doctors provide babies born before viability with pain medications because "you'd still want that baby to be comfortable in the last minutes of its life." And, of course, anesthesia is standard medical procedure for fetal surgeries. Undoubtedly, as Plaintiffs point out, there is disagreement in the medical literature about when a fetus can experience pain. But that doesn't remove any weight from the State's interest. The State is permitted to err on the side of caution by banning the live dismemberment of a fetus that might feel pain. "Medical uncertainty does not foreclose the exercise of legislative power in the abortion context any more than it does in other contexts."[99] Or, as the Chief Justice put it in his controlling *June Medical* concurrence, "the 'traditional rule' that 'state and federal legislatures [have] wide discretion to pass legislation in areas where there is medical and scientific uncertainty' is 'consistent with *Casey*.'"[100]

Second, the majority diminishes the State's asserted interest in the integrity and ethics of the medical profession because SB8 forces abortion doctors to conduct unnecessary and painful procedures: "Whatever SB8 arguably may do to advance the State's interest in the medical profession is negated by the Act's forcing of physicians to act contrary to what is best in their medical judgment for their patients." The majority apparently believes the medical profession's integrity only encompasses an abortion doctor's preferred method of abortion. The majority gives no weight to, or even

---

[99] *Id.* at 164.

[100] *June Medical*, 140 S. Ct. at 2136 (Roberts, C.J., concurring) (alteration in original) (quoting *Gonzales*, 550 U.S. at 163).

mentions, the State's interest in how unborn children are killed. This flies in the face of *Gonzales*: "[T]he State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn."[101]

As one bioethicist testified, it's "self-evident that it's brutal and inhumane to tear a living organism limb from limb alive." Indeed, killing an animal this way is a crime under Texas law.[102] The State's interest in preventing abortion doctors from ending fetal human life in a way someone could not legally kill an animal merits weight on the scale.

Third, the majority distorts the State's asserted interest in informed consent beyond recognition. The State argues that abortion providers do not fully inform women of what a live-dismemberment abortion entails. This lack of information "is of legitimate concern to the State."[103] The majority states, however, that this interest "is wholly undermined by the fact that the statute does not require that women receive information on how fetal demise occurs."

But the federal Partial-Birth Abortion Ban Act didn't contain any informed-consent requirement. It was just a ban on intact D&E. Yet the Court found that the ban by its very nature furthered the government's interests in informed consent regarding abortion procedures:

> It is self-evident that a mother who comes to regret her choice
> to abort must struggle with grief more anguished and sorrow
> more profound when she learns, only after the event, what she

---

[101] *Gonzales*, 550 U.S. at 158.

[102] Tex. Penal Code § 42.092.

[103] *Gonzales*, 550 U.S. at 159.

56

once did not know: that she allowed a doctor to pierce the skull and vacuum the fast-developing brain of her unborn child, a child assuming the human form.[104]

Because abortion entails a "difficult and painful moral decision," banning a brutal form of abortion helps inform women in general about abortion procedures, possibly "reducing the absolute number of late-term abortions."[105] And the "medical profession . . . may find different and less shocking methods to abort the fetus in the second trimester."[106] The State's interests are therefore "advanced by the dialogue that better informs the political and legal systems, the medical profession, expectant mothers, and society as a whole of the consequences that follow from a decision to elect a late-term abortion."[107]

After dismissing all of the State's interests, the majority concludes that "SB8's significant burdens upon female patients" outweigh the "nonexistent health benefits and any other limited benefits it may actually confer." Thus, according to the majority, "the law places a 'substantial obstacle in the path of a woman seeking' a previability abortion."

By giving essentially no weight to the State's interests, the majority casts aside *Casey* and *Gonzales*. And by agreeing with the district court that SB8 imposes "significant burdens," the majority takes a one-sided view of the record. In sum, no balancing occurred below or in the majority opinion. And when an actual balancing test is applied, SB8 passes.

---

[104] *Id.* at 159–60.

[105] *Id.*

[106] *Id.* at 160.

[107] *Id.*

IV

I turn now to the final fatal flaw in the majority's analysis. The majority opinion spends its last page explaining why SB8 is facially unconstitutional—"it imposes an undue burden on *every* Texas woman" seeking an abortion between 15–20 weeks' gestation. This fanciful assertion is refuted—emphatically—by the record.

Sweeping generalizations make for very bad law. And when the issue is facial invalidity, such blanket generalizations are verboten. Yet the majority decides that all fetal-demise procedures (apparently even the ones not proposed by the State) "are dangerous, painful, invasive, and potentially experimental." Even crediting Plaintiffs' arguments regarding the "risks" of the three fetal-demise procedures discussed above, those arguments do not apply to all pregnant women between 15–20 weeks' gestation. But neither Plaintiffs nor the majority account for any of these variations.

For example, the majority finds that the use of digoxin before 18 weeks is "experimental." Even if this were true, which the record contradicts, what about women between 18–20 weeks of pregnancy? During this timeframe, some Plaintiffs *require* digoxin for fetal demise.

Or take the availability of suction to cause fetal death, which SB8 doesn't ban, between 15–17 weeks. An abortion provider at Planned Parenthood of Greater Texas testified that if SB8 went into effect, she would use suction up to 16.6 weeks. Plaintiffs' only response is that "for some patients," suction could not be used. But Plaintiffs are not bringing this pre-enforcement lawsuit on behalf of those "some patients." They have launched a *facial* challenge to SB8's constitutionality. In the non-abortion context, facial attacks are reserved for exceptional circumstances because a

plaintiff must show that the law could *never* be constitutionally applied.[108] But in abortion cases, the facial-challenge test is phrased less stringently. In *Hellerstedt*, the Supreme Court applied something resembling the *Casey* plurality's math-oriented approach: An abortion restriction is facially invalid if "in a large fraction of the cases in which it is relevant, it will operate as a substantial obstacle."[109] While facial invalidity under "large fraction" may be a lower bar than under "no set of circumstances," it is not subterranean.

Even so, the district court declared SB8 facially invalid without holding Plaintiffs to the evidentiary burden of the "large fraction" test. It invalidated SB8 absent proof of its actual impact on any number of real women, thus allowing Plaintiffs to evade the requirements of a facial challenge.

Strangely, Plaintiffs argue that requiring the use of fetal-demise techniques is facially unconstitutional because "none are 100% effective." This turns facial validity on its head: Fetal demise is unconstitutional all of the time because the techniques don't work some of the time. Plaintiffs distort Texas's burden. The State need not prove that every alternative works every time for every woman. As the Supreme Court put it in *Gonzales*, a state need only show "the availability of . . . safe alternatives" to live dismemberment.[110] Texas has done exactly that. Again, Plaintiffs concede that they regularly use digoxin to cause fetal death. And Planned Parenthood concedes that umbilical-cord transection "immediately prior to D&E" is "an

---

[108] Some of our earlier decisions involving facial challenges to abortion-related laws used similar "no set of circumstances" language. *Barnes v. State of Miss.*, 992 F.2d 1335, 1342 (5th Cir. 1993); *see also Barnes v. Moore*, 970 F.2d 12, 14 n.2 (5th Cir. 1992).

[109] 136 S. Ct. at 2320.

[110] 550 U.S. at 166–67.

appropriate alternative to digoxin" and "a feasible, efficacious, and safe way to induce fetal demise."

The district court and the majority make no attempt to quantify any of the medical risks of fetal-demise techniques. Instead, they've decided that if you stack up enough speculation, it results in significant risks for "every Texas woman." The Supreme Court's abortion precedents prohibit such straw-grasping. As-applied challenges are "the proper manner to protect the health of the woman if it can be shown that in discrete and well-defined instances a particular condition has or is likely to occur in which the procedure prohibited by the Act must be used."[111] This is because "[i]n an as-applied challenge the nature of the medical risk can be better quantified and balanced than in a facial attack."[112]

To sum up, this record does not come close to justifying the facial invalidation of SB8.[113] As the Court stressed in *Gonzales*, "[a]s-applied challenges are the basic building blocks of constitutional adjudication."[114] Those seeking facial relief must show that SB8 would be unconstitutional in a "large fraction" of relevant cases. This demands real-world evidence, not isolated hypotheticals.

---

[111] *Gonzales*, 550 U.S. at 167.

[112] *Id.*

[113] "The medical uncertainty over whether the Act's prohibition creates significant health risks provides a sufficient basis to conclude in this facial attack that the Act does not impose an undue burden." *Id.* at 164.

[114] *Id.* at 168 (quoting Fallon, *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1328 (2000)).

V

*Roe v. Wade* is almost a half-century old. It was argued twice in the Supreme Court and has been argued nonstop in the court of public opinion ever since. Five decades later, the constitutional underpinnings of abortion law continue to bedevil American politics, law, and culture.

But today's case is a modest one. Again, SB8 does not *proscribe* D&E; it *prescribes* D&E that is marginally more humane. D&E is common, if uncommonly "distasteful" (to borrow the district court's understatement). The majority opinion pits the rights of those seeking abortion against the State's legitimate interest in respecting the dignity of fetal life, cheering the former and jeering the latter. But SB8 doesn't present this false choice. It shutters no clinics who offer D&E abortions; it deters no women who seek them. The lone thing SB8 seeks to ban is a particular form of brutality: dismembering a living unborn child. And the record below—including Plaintiffs' own admissions—makes clear that safe and effective alternatives to live-dismemberment abortion are not just available but plentiful. On this record, Plaintiffs have failed to show that SB8 places a substantial obstacle in the path of even *one* woman seeking a D&E abortion in Texas, much less a large fraction of women. As 2021 approaches, I would allow the State of Texas to enforce (finally) a law that the people's representatives passed almost four years ago.

I dissent.

More, I urge the en banc court to align our circuit's abortion jurisprudence with controlling Supreme Court precedent that recognizes the validity of a State's legitimate and substantial interest in valuing unborn life.